IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NICK MYERS       :

           :

 v.        : Civil Action No. DKC 14-3054

           :

MONTGOMERY COUNTY, MARYLAND :

           :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is a motion to dismiss filed by Defendant Montgomery County. (ECF No. 6). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

**I.   Background**

The following facts are drawn from the corrected complaint. Plaintiff Nick Myers ("Mr. Myers" or "Plaintiff")[1] is a fifty-year-old Caucasian male who began working for the Montgomery County Department of Health and Human Services on December 5, 1994. (ECF No. 3 ¶ 10). Plaintiff worked in the Information Technology Unit before he was transferred to the Services Eligibility Unit ("SEU") on July 11, 2011, which is when

_____

[1] Plaintiff's attorney provides varying spellings of her client's last name throughout the complaint. (*Compare* ECF No. 3 ¶ 10 with ¶ 12). The court assumes the spelling indicated in the case caption is accurate.

problems ensued for him. Plaintiff was transferred to SEU to work as an Income Assistance Program Specialist due to a reduction in force. (*Id.* ¶ 11). Plaintiff states that SEU is predominantly African-American and that he was and remains the only Caucasian male in that unit. (*Id.* ¶ 12). Monica Talley became Plaintiff's supervisor at SEU.[2] (*Id.* ¶ 14). According to Plaintiff, he "experienced different treatment on the part of Ms. Talley from the beginning of [his] employment with SEU." (*Id.*). For instance, Plaintiff contends that Ms. Talley "continually interrupted his training to take phone calls, or attend to other duties. Furthermore, she would not allow anyone else in the unit to help train [Plaintiff]." (*Id.* ¶ 15). Plaintiff contends that he lacked training in his position with SEU, and when he fell behind on his work resulting from the alleged lack of training, "Ms. Talley began to send [him] emails and reprimands." (*Id.* ¶ 17). He states that when his co-workers attempted to help him, they were reprimanded and told that they would be formally disciplined. (*Id.* ¶ 18). Plaintiff alleges that "[p]rior to his transfer to SEU, he received uniformly satisfactory work performances and was regarded as helpful and courteous with customers. He has had [a] clean

---

[2]   Plaintiff describes Ms. Talley as an "African American/Hispanic female." (ECF No. 3 ¶ 14).

record and had never been the subject of disciplinary action."
(*Id.* ¶ 20).

The complaint further avers that on or about October 21,
2011, Plaintiff represented his co-worker, Lucinda Ramsey (a
Caucasian female) as "her union steward in a meeting with
management officials, which included Ms. Talley." (*Id.* ¶ 21).
Plaintiff "informally told management officials [during that
meeting] that he was not being properly trained by Ms. Talley."
(*Id.*). Less than one month after that meeting, on November 10,
2011, Ms. Talley filed an EEO complaint against Plaintiff and
Ms. Ramsey "claiming that they were creating a hostile work
environment on the basis o[f] racial discrimination; in
essence[,] she accused Mr. [Myers] and Ms. Ramsey of being
racists." (*Id.* ¶ 22). Four days later, on November 14, 2011,
both Plaintiff and Ms. Ramsey were placed on administrative
leave and transferred to other locations. (*Id.* ¶ 23).
Plaintiff insinuates that Ms. Ramsey's placement was better than
his, however. Specifically, Plaintiff explains that he "was
transferred to a remote work [location] that was not within the
SEU and was [] further away from his home[,]" while Ms. Ramsey
was allowed to remain in SEU at a location that was only ten
miles further away from her former location. (*Id.*). He
describes his new location as "a storage pod" where he was given
"significantly less work and was prevented from performing work

that was associated to the work he was supposed to be doing in SEU." (*Id.* ¶ 24). He further contends that in his new position, he was not "allowed to do the customary overtime, which means his take home salary was also reduced." (*Id.*). In his new work location, Plaintiff also was without a supervisor, without work responsibilities for the period of the transfer, and without a working phone for three (3) months. (*Id.* ¶ 25). Additionally, Plaintiff states that while at the new location, "he was excluded from emails and trainings and was not notified of events within the Unit." (*Id.* ¶ 27).

On February 7, 2012, Plaintiff complained to the union about his new work location and conditions and the union filed a grievance on his behalf. Whereas Plaintiff had received only (eighteen) 18 cases to work on until February 2012 – a light load about which Plaintiff was unhappy – he was sent thirty-four (34) cases in one week after the union filed a grievance, which Plaintiff states is "an extremely large volume of casework." (*Id.* ¶ 26). On May 5, 2012, Plaintiff was notified about the dismissal of Ms. Talley's EEO charge against Ms. Ramsey and him. (*Id.* ¶ 28). On June 6, 2012, Plaintiff informally was advised that "he could return to the Germantown SEU and was accordingly transferred on June 25, 2012." (*Id.* ¶ 29).

Plaintiff states that conditions did not improve for him even after his return to SEU. Plaintiff contends that he

4

"continued to receive disparate treatment from Ms. Talley and management.   Three months after his return, he was still not allowed to process State cases that are customary and necessary for his position.   He was excluded from internal email communications that were being sent to all staff." (*Id.* ¶ 30).

On August 16, 2012, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   (*Id.* ¶ 31).   Plaintiff contends that "[d]uring the EEOC process, [he] was still experiencing disparate treatment based on his race." (*Id.* ¶ 33).   He recounts an incident from April 3, 2014, when a co-worker, a Hispanic female, allegedly assaulted him in front of witnesses; specifically, his co-worker apparently "pushed into his shoulder moving him out of the way to sit down in front of him." (*Id.* ¶ 34).   Plaintiff states that despite the assault on him, the "aggressor" was not reprimanded or suspended, yet he was issued a reprimand by Ms. Talley. (*Id.* ¶ 35).   The complaint also avers that "[o]n July 2014, he was singled out for a written reprimand and threatened with termination of his employment." (*Id.* ¶ 48).

The EEOC issued a right-to sue-letter on June 26, 2014. (ECF No. 7-2, at 5).   Plaintiff filed a corrected complaint in this court on September 30, 2014 asserting as a single count race and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964.   In the opening paragraph of

5

his complaint, Plaintiff also lists violations of "Title 20 of the Maryland State Government Article § 20-101; the Civil Rights Act of 1991, 42 U.S.C. § 1981a." (*See* ECF No. 3, at 1). Defendant moved to dismiss on November 6, 2014. (ECF No. 6). Plaintiff opposed the motion (ECF No. 7), and Defendant replied (ECF No. 8).

## II.  Standard of Review

The arguments raised by Defendant in its motion to dismiss – lack of subject matter jurisdiction and failure to state a claim – implicate different standards of review. First, "a failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009). A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(1). Generally, "questions of subject matter jurisdiction must be decided 'first, because they concern the court's very power to hear the case.'" *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999) (*quoting* 2 James Wm. Moore, et al., *Moore's Federal Practice* § 12.30[1] (3d ed. 1998)). The plaintiff always bears the burden of proving that subject matter jurisdiction properly exists in federal court. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). In considering a

Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it.  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4ᵗʰ Cir. 1991); *see also Evans*, 166 F.3d at 647.  The court should grant such a motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768.

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4ᵗʰ Cir. 2006).   A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the

light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  In evaluating the complaint, unsupported legal allegations need not be accepted.  *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (*quoting* Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

The recent analysis undertaken by the United States Court of Appeals for the Fourth Circuit in explaining the standard of review on a motion to dismiss in the context of a Title VII claim is instructive:

Federal Rule of Civil Procedure 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted). But this rule for pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Instead, a complaint must contain "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *Id.; see also Iqbal*, 556 U.S. at 678 (holding that a complaint "tender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not "suffice" (*quoting Twombly*, 550 U.S. at 557)). The Supreme Court has accordingly held that Rule 8(a)(2) requires that "a complaint . . . contain[] sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face'" in the sense that the complaint's factual allegations must allow a "court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added).

*McCleary-Evans v. Maryland Dept. of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

## III. Analysis

### A. Timeliness

Defendant argues that Plaintiff's claims related to events occurring before October 21, 2011 and any events occurring in 2014 are untimely and cannot be considered. Title VII requires a plaintiff to file an EEOC charge within a prescribed

limitations period.   42 U.S.C. § 2000e-5(e)(1).   In deferral states such as Maryland, that limitations period is 300 days from the date of the allegedly discriminatory act.  *Id.*  "Courts strictly adhere to these times limits and rarely allow equitable tolling of limitations periods."  *Khoury v. Meserve*, 268 F.Supp.2d 600, 606 (D.Md. 2003), *aff'd*, 85 F.App'x 960 (4th Cir. 2004).

The allegations in Plaintiff's complaint primarily relate to the following events and time periods: (1) his reassignment to SEU on July 11, 2011 and the alleged lack of training in that unit; (2) his temporary transfer in November 2011 to a "storage pod" at a remote location after Ms. Talley filed an EEO complaint against him; and (3) the alleged physical assault by his coworker in April 2014 for which Plaintiff, and not the "aggressor," was reprimanded.   Plaintiff filed his EEO charge on August 16, 2012, meaning that only those discriminatory acts which occurred within 300 days of that date are timely filed. Consequently, Defendant contends that any allegations describing conduct that occurred before October 21, 2011 (300 days prior to August 16, 2012) and in April 2014, which post-dates his EEO charge, should not be considered in connection with his race and gender discrimination claims.[3]   (ECF No. 6-1, at 9).   In

---

[3] "The scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents."  *Jones v.*

response, Plaintiff invokes the "continuing violation" theory, which "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (*citing Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 118 (2002)). Plaintiff argues:

> [Plaintiff], pursuant to the continuing violation doctrine, details in his instant Complaint the same repeating sets of related and ongoing discriminatory acts; he has described an ongoing action against him from the July 11, 2011 date of his transfer to SEU through the filing of this lawsuit. Therefore, all such repeated and continuing identical acts of discrimination as alleged by Plaintiff, created, as a matter of law, one continuously hostile work environment from July 11, 2011 to September 30, 2014, with this continuing violation doctrine thereby eliminating the usual 300-day limitations period[,] which typically bars legal remedy.

(ECF No. 7-1, at 9).

Plaintiff's arguments are unavailing.  Judge Blake recently explained the continuing violation doctrine and its application

---

*Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).  Here, there is no indication that the April 2014 event was actually investigated by the EEOC or that it could be expected to be included as part of his August 2012 charge, such as a retaliation claim.  *See, e.g., Jones*, 551 F.3d at 303-04.

in *Walker-Pittman v. Maryland Dept. of Transp.*, Civ. No. CCB-14-202, 2015 WL 419806, at *6-7 (D.Md. Jan. 29, 2015):

> Walker-Pittman's transfers and the reduction of her job duties occurred more than 300 days prior to her filing an EEOC charge. . . . She attempts to overcome this bar by relying on the continuing violation doctrine announced by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).
>
> *Morgan*, however, held that when a plaintiff brings a claim involving a discrete discriminatory or retaliatory act, she must file her charge within 180 or 300 days of that act. *Id.* at 113. Therefore, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* Furthermore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* In *Morgan*, the court provided examples of what constitutes a "discrete act," including "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.
>
> The court in *Morgan* distinguished discrete acts from "hostile work environment claims." *Id.* at 115. These claims, by "[t]heir very nature involve[] repeated conduct," *id.*, because a "hostile work environment is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (*citing* 42 U.S.C. § 2000e-5(e)(1)). Because the conduct is repeated, it "cannot be said to occur on any particular day" and, unlike discrete acts "a single act of harassment may not be actionable on its own." *Id.* at 115. Given these characteristics, the court held that an employer may be found liable for "all acts that are part of . . . [a] single claim" of hostile work environment, even those that

12

occurred outside the limitations period. *Id.* at 118.

Although Plaintiff now attempts to characterize his claims as supporting a "continuously hostile work environment from July 11, 2011 to Sept[ember] 30, 2014," (ECF No. 7-1, at 9), his labeling of the acts he complains about as constituting a "hostile work environment" do not transform them into such to trigger the continuing violation exception to the timeliness requirement. Notably, Plaintiff did *not* allege a hostile work environment claim in his complaint.[4] The only mention of a hostile work environment in the complaint is the broad allegation that "[t]he discrimination and hostile work environment has continued throughout the past years." (ECF No. 3 ¶ 36). Nowhere in the complaint does Plaintiff detail how any of the allegedly discriminatory acts rise to the level of a hostile work environment, which requires plausible allegations that the harassment was "sufficiently severe or pervasive to alter the conditions of [] employment and [] create an abusive atmosphere[.]" *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006); *see also Tawwaab v. Va. Linen Serv., Inc.*, 729 F.Supp.2d

---

[4] Moreover, Plaintiff did not assert a hostile work environment claim in his EEO charge. Plaintiff alleged race and sex discrimination, and retaliation in his EEO charge. (ECF No. 7-2, at 1). He stated: "I believe I was subjected to a transfer, unequal terms and conditions of employment, and denied training because of my race (White), sex (male), and in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964)." (*Id.*).

13

757, 777 (D.Md. 2010) ("Courts usually only allow hostile work environment claims to proceed where the [harassment] is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance."); *Young v. Giant Food Stores, LLC*, No. PWG-14-2006, ---F.Supp.3d----, 2015 WL 3556009, at *7 (D.Md. June 8, 2015) ("Title VII is not a general civility code and it does not provide a remedy for the ordinary tribulations of the workplace. . . . Though hardly pleasant, the disrespectful conduct alleged by Young is not sufficient to give rise to a hostile work environment claim." (internal quotation marks and citations omitted)).

Indeed, the allegations in the complaint pertain to discrete acts. *See Szedlock v. Tenet*, 61 F.App'x 88, 93 (4th Cir. 2003) ("*Morgan* . . . makes clear that unless the plaintiff alleges a hostile work environment [claim] . . . each instance of discrimination is a discrete act."). As set forth in the fact section above, Plaintiff complains that he was denied proper training by Ms. Talley when in SEU, that he was reprimanded by her when he fell behind on his work, and that his coworkers were instructed not to assist him. Next, he complains about the temporary transfer in November 2011 to a "storage pod" after he represented Ms. Ramsey in a union meeting with management officials and mentioned the inadequate training, which apparently prompted Ms. Talley to file an EEO complaint

14

against Plaintiff and Ms. Ramsey.   Then, Plaintiff discusses an incident from April 2014, nearly two years after he filed his EEO charge in August 2012, when he was allegedly assaulted by a female coworker, yet he was reprimanded.   Without providing any additional context, Plaintiff also asserts that he "had to wait an inordinately long period of time – eight (8) weeks to be exact – to receive a Client's Automated Resource and Eligibility System (CARES) log in ID while other county employees received same within seven (7) days."   (ECF No. 3 ¶ 39).

Although Plaintiff broadly avers throughout his complaint that "[t]he unfair and discriminatory treatment has continued until present," none of the acts about which he complains involve "repeated conduct" that "cannot be said to occur on any particular day" which together constituted a hostile work environment.   *Morgan*, 536 U.S. at 115.   Along the same lines, none of the acts that Plaintiff characterizes as constituting ongoing discrimination are related so as to infer plausibly a continuing violation; they are discrete acts which occurred on specific, identifiable days.   Judge Williams's analysis on this point in *Crockett v. SRA International*, 943 F.Supp.2d 565, 572 (D.Md. 2013), applies here:

> In this case, Plaintiff has inadequately alleged the existence of a continuing violation.   *Although Plaintiff argues that Defendant continually discriminated against her, a close*

> *examination of her Complaint reveals that
> she alleged five distinguishable instances
> of discrimination*: (i) Defendant's failure
> to promote her in 2005-2006; (ii) an
> employee's plotting against her with respect
> to the NARA contract in October 2007; (iii)
> being assigned to an "undesirable" DOJ
> contract in 2009; (iv) Defendant's
> marginalization of her with respect to the
> FDIC contract in February 2010 to March
> 2011; (v) the January 2011 incidents in
> which two people told her that she made a
> poor presentation with respect to the FDIC
> contract; and (vi) a subsequent incident in
> which an employee criticized her work ethic.
> . . . [T]he alleged instances of
> retaliatory conduct commencing in 2007 do
> not "involve the same type of
> discrimination" as the alleged failure to
> promote, which weighs against the existence
> of a continuing violation. . . .
> Additionally, the five instances of alleged
> discrimination following the 2005-2006
> failure to promote are too distinct from
> each other in terms of time and content to
> constitute a continuing violation. In
> short, Plaintiff's allegations fail to
> support a plausible inference that she was
> unaware of the facts giving rise to her
> claim until July 2011 or that Defendant's
> conduct was otherwise part of a continuing
> violation.

(emphasis added); *see also Szedlock*, 61 F. App'x at 93 ("Early

discriminatory actions by the CIA cannot be made timely simply

because they resemble later discriminatory actions.").

Based on the foregoing, Plaintiff may not rely on any

allegedly discriminatory acts that occurred before October 21,

2011 or the alleged assault from his coworker in April 2014.

**B.    Title 20 of the Maryland State Government Code**

Plaintiff also states in his complaint that the "unlawful employment practices on the basis of race [] and sex" violated Title 20 of the Maryland State Government Article § 20-101." (ECF No. 3, at 1).  Title 20, otherwise known as Maryland's Fair Employment Practices Act ("MFEPA"), prohibits "employer[s]" from "fail[ing] or refus[ing] to hire, discharge[ing], or otherwise discriminat[ing] against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's race . . . sex . . . . [or] sexual orientation."  Md. Code Ann., State Gov't § 20-606(a)(1)(i).  MFEPA permits a litigant to bring a civil action if: (1) he files a timely administrative charge; (2) at least 180 days have elapsed since the filing of the administrative charge; *and* (3) the civil action is filed within two years after the alleged unlawful employment practice occurred.  *Id.* § 20-1013(a).

Defendant argues that Plaintiff cannot base his Title 20 claim on any events that occurred before September 27, 2012, two years prior to his filing the instant complaint.  Plaintiff does not respond to this argument in the opposition other than generally relying on the continuing violation doctrine, which is inapplicable for the reasons explained above.  In the complaint, Plaintiff refers to the April 2014 assault by the coworker as

17

the only allegedly discriminatory act that post-dated September 27, 2012, but as explained, Plaintiff may not rely on this incident as he did not file a separate EEO charge pertaining to it.  Accordingly, the MFEPA claim is time-barred.

### C.   Race and Gender Discrimination

Defendant argues that Plaintiff fails to state claims for race and gender discrimination.  The only timely incident on which Plaintiff may rely to support his discrimination claims is the temporary transfer in November 2011, pending resolution of Ms. Talley's EEO complaint against him.  Plaintiff asserts that during his temporary transfer, he received significantly less casework, lost the opportunity to obtain overtime benefits, had to travel further away from home, was without access to a working phone for three months, and essentially had to work in a "storage pod" until his return to SEU on June 25, 2012.  (*See* ECF No. 3 ¶¶ 22-29).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To survive a motion to dismiss a claim for discrimination, Plaintiff must allege that he was terminated or

18

otherwise treated less favorably "because of" his race or sex. Citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), Defendant contends that to state a claim for race or sex discrimination, the complaint must include factual allegations that: (1) Plaintiff is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside his protected class more favorably.  (ECF No. 6-1, at 13).  The plaintiff in *Coleman*, however, asserted that he was terminated based on his race, making the second element above applicable for a *prima facie* case.  Here, Plaintiff is not asserting a discriminatory discharge claim, but rather challenges his temporary transfer as having been motivated by race and sex.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973) (noting that the precise formulation of the required prima facie showing will vary in "differing factual situations.").  A plaintiff *proves* a violation of Title VII either by direct evidence of discrimination or, in the absence of direct evidence, by following the burden-shifting framework of *McDonnell Douglas*. At the motion to dismiss stage, however, Plaintiff is not required to set forth a *prima facie* case for each element; instead, he is required to set forth a plausible claim of discrimination.  *See, e.g., Doyle v. City of Chicago*, 943

F.Supp.2d 815, 823 (N.D.Ill. 2013) ("At the motion to dismiss stage, a complaint need not allege facts in support of each element, and it is sufficient if it alleges that the employee was discriminated against because of his race.") (internal quotation marks omitted).   A plaintiff in an employment discrimination suit is generally required to plead that the employer took an adverse action against him "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The analysis in *Paxson v. County of Cook, Illinois*, No. 02 C 2028, 2002 WL 1968561, at *3 (N.D.Ill. Aug. 23, 2002), adjudicating a motion to dismiss in a reverse discrimination case is instructive:

> . . . [T]he Seventh Circuit has held that a reverse discrimination plaintiff must make a showing of background circumstances sufficient to demonstrate that they are members of a protected class.   Such background circumstances includes allegations that the particular employer at issue has some inclination or reason to discriminate against the majority or allegations that indicate that there is something "fishy" about the facts of the case.  *Mills v. Health Care Services Corp.*, 171 F.3d 450, 455–57 (7th Cir. 1999). [] Background circumstances "support an inference that the defendant is one of those unusual employers who discriminates against the majority."   *Mills*, 171 F.3d at 455 [([]quoting *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997).

The Seventh Circuit also noted in *Mills* that "if a plaintiff cannot show background circumstances, but 'has established a logical reason to believe that the [employer's] decision rests on a legally forbidden ground,' . . . he may shift the burden to the defendant to prove the challenged employment action was actually based on legitimate, non-discriminatory reasons." *Mills*, 171 F.3d at 457.

In the instant case, Paxson has sufficiently pled the minimum facts necessary to place Defendants on notice of his claim. The facts alleged, including that he was treated differently than all similarly situated non-white employees and that his allegations of reverse race discrimination and harassment did not get investigated, are enough to provide this Court with the background circumstances necessary to allow Plaintiff to proceed with the Complaint at this stage of the proceedings.

The allegations here are sufficient to survive dismissal of both the race and sex discrimination claims. Plaintiff has alleged sufficiently that the temporary transfer constituted an adverse employment action. An adverse employment action is a discriminatory act that adversely affects the "terms, conditions, or benefits" of employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). Typically, an adverse employment action includes "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Gordin*, 178 F.3d 253, 255 (4th Cir. 1999). Defendant contends

that Plaintiff's job title and regular level of pay were not at all affected by his temporary transfer.  "Although a transfer to a new job assignment [that] is subjectively less appealing to employee is not [by itself] a 'materially adverse' employment action[,] *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 375, courts have found that a new job assignment with reduced supervisory duties or diminished responsibility can constitute an adverse employment action." *Fordyce v. Prince George's County Maryland*, 43 F.Supp.3d 537, 548 (D.Md. 2014) (internal quotation marks omitted); *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C.Cir. 2007) (noting that a lateral transfer can constitute an adverse employment action if it results in the withdrawal of an employee's "supervisory duties" or "reassignment with significantly different responsibilities" (internal quotations and citations omitted)); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206-07 (2$^{d}$ Cir. 2006) (stating that a transfer is an adverse employment action if it causes a "radical change in nature of the [plaintiff's] work" (internal quotations and citations omitted)).

Here, the complaint asserts that the temporary transfer adversely affected the terms, conditions, and benefits of his employment.  Specifically, Plaintiff explains that he essentially worked in a "storage pod" with significantly fewer responsibilities and reduced workload, which meant no

opportunity for overtime and reduction of "take home salary." He also states that he was "prevented from performing work that was associated to the work he was supposed to be doing in SEU" and that he had no supervisor or phone for three months. (ECF No. 3 ¶¶ 24-25). Furthermore, Plaintiff avers that he incurred travel expenses because the new location was further away from his home. (*Id.* ¶ 45). He states that the loss of overtime paired with the added distance of the new location decreased his net compensation.[5] Based on the allegations in the complaint, it is plausible that the transfer constituted an adverse employment action.

Finally, Plaintiff articulates facts in the complaint that give rise to an inference of reverse discrimination. Plaintiff asserts that he was the only Caucasian male in SEU and that the unit is predominantly African American. (ECF No. 3 ¶ 12).

---

[5] Defendant also argues that "all of Plaintiff's claims arising out of his temporary transfer are moot at this point, as they were resolved by the settlement of the union grievance encompassing those issues." (ECF No. 6-1, at 19). Defendant attaches as an exhibit to its motion to dismiss the settlement agreement with Plaintiff regarding his temporary transfer. (ECF No. 6-2). Defendant asserts that "Plaintiff was returned to his original location and allowed to request reimbursement for the difference in the mileage he was required to travel to and from work. . . . In light of the settlement agreement, all of the issues relating to [Plaintiff's] transfer were resolved and need not be re-hashed in federal court." (ECF No. 6-1, at 19-20). Because Defendant moved to dismiss, and not for summary judgment, and the complaint neither mentions the settlement agreement nor does Plaintiff attach it as an exhibit thereto, it cannot be considered.

Although the complaint is not entirely clear as to whether Ms. Talley directed the temporary transfer, Plaintiff asserts that less than one month after he participated in the union meeting with Ms. Talley, an African American woman, she filed a hostile work environment claim against Ms. Ramsey (a white female) and him on the basis of race, and shortly thereafter, both of them were placed on administrative leave and transferred to other locations.[6]  (ECF No. 3 ¶¶ 22-23).  Accordingly, at this stage, Plaintiff has alleged plausible facts that the adverse employment action – the temporary transfer to what Plaintiff characterizes as a "storage pod" - was taken against him on the basis of race.

As for the gender discrimination claim, Defendant argues that "[s]ince Plaintiff has only identified one other co-worker who had an EEO complaint filed against her, and she was treated similarly, he has not provided any basis for a charge of gender discrimination." (ECF No. 6-1, at 14).  Plaintiff counters:

> Defendant erroneously concludes that [Plaintiff] was treated in the same manner as Ms. Ramsey.  Ms. Ramsey was not transferred to the same location during the investigation of the discriminatory allegations.  Ms. Ramsey was placed in a work environment comparable to her previous work environment whereas [Mr. Myers] was not (described in the complaint).  [Mr. Myers]

---

[6] The complaint asserts that Ms. Talley essentially "accused [Mr. Myers] and Ms. Ramsey of being racists." (ECF No. 3 ¶ 22).

> wasn't only transferred but he was also
> reassigned and placed in a different unit
> with minimal supervision available.  Ms.
> Ramsey even wondered why Defendant would
> place [Mr. Myers], as opposed to her, in a
> new and different unit with little to no
> supervision since he was yet to be fully
> trained.  (*See* Exhibit B – Lucinda Ramsey
> Affidavit).[7]

(ECF No. 7-1, at 12-13).

The gender discrimination claim will not be dismissed. "[T]he reality [is] that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).  Here, although Ms. Ramsey also was transferred, Plaintiff avers that while he was transferred "to a remote work [location] that was not within the SEU and . . . further away from his home[,] . . . . Ms. Ramsey was allowed to remain in the SEU at a location that was only 10 miles further away from her former location."  (ECF No. 3 ¶ 23).  Defendant argues that "[e]ven if there was some minor difference in the location to which they were transferred, there is absolutely no basis for believing that this minor distinction was based on their differing genders."  (ECF No. 8, at 8).  Plaintiff also avers, however, that Ms. Ramsey was allowed to remain within SEU, but

---

[7] Plaintiff attaches as an exhibit to his opposition an affidavit from Lucinda Ramsey, (ECF No. 7-3), but it cannot be considered on a motion to dismiss.

he "was prevented from performing work that was associated to the work he was supposed to be doing in SEU." (ECF No. 3 ¶ 24). Although sparse, considering the well-pled allegations of the complaint in the light most favorable to Plaintiff, they suffice to set forth a plausible claim that he was transferred temporarily on the basis of his gender.

### D.   Remaining Claims

The corrected complaint also asserts claims under the Civil Rights Act of 1991, 42 U.S.C. § 1981 *et seq.*, and retaliation under Title VII.   In the motion to dismiss, Defendant argues that 42 U.S.C. § 1981 does not apply because 42 U.S.C. § 1983 is the only vehicle to assert claims against a state actor.   *See, e.g., Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) ("§ 1983 . . . provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) ("To the extent that [the race discrimination claims against the County of Fairfax] were pleaded under § 1981, they run afoul of *Jett* . . . [T]he § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities.").   Defendant also contends that Plaintiff has not stated a claim for retaliation.   To state a claim for retaliation, Plaintiff must allege that: (1) he engaged in a

26

protected activity; (2) his employer acted adversely against him; and (3) the protected activity was causally connected to the adverse employment action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). Nowhere in the complaint does Plaintiff identify any protected activity in which he engaged for which Defendant retaliated against him and which specific acts he believes were retaliatory.

Plaintiff does not respond to these arguments from Defendant in his opposition. By failing to respond to these facially valid arguments, Plaintiff abandons both claims. *See Ferdinand-Davenport v. Children's Guild,* 742 F.Supp.2d 772, 777 (D.Md. 2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim."); *Mentch v. Eastern Sav. Bank, FSB,* 949 F.Supp. 1236, 1247 (D.Md. 1997) (holding that failure to address defendant's arguments for summary judgment in the opposition brief constituted abandonment of claim).

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss will be granted in part and denied in part. A separate order will follow.

/s/

DEBORAH K. CHASANOW
United States District Judge